FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 24 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA,

        -against-

ROY HAYNESWORTH,

        Defendant.
----------------------------------------------------------X

DECISION AND ORDER
12-CR-86 (WFK)

## INTRODUCTION

The United States Supreme Court held in *Mapp v. Ohio*, 367 U.S. 643 (1961) that no evidence obtained as a result of an unlawful search and seizure may be used in a criminal prosecution. Judge, later Justice, Benjamin Cardozo summarized the exclusionary rule in his iconic phrase: "The criminal is to go free because the constable has blundered." *People v. Defore*, 242 N.Y. 13, 21 (1926). The motion to suppress the gun discovered and the statements made after arrest present the question of whether or not the constables blundered. After hearing the parties and the witnesses to the events in this case, after assessing the credibility of those witnesses, after reviewing the authorities cited by counsel and after determining the facts material to the resolution of the motion, this Court has a one word answer to the question presented: No. These constables did not blunder. This criminal does not go free. The motion to suppress is denied.

1

## BACKGROUND

Defendant Roy Haynesworth ("Defendant") was indicted on January 30, 2012 on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Defendant moves pursuant to Federal Rules of Criminal Procedure 12(b)(3) and 41(h) to suppress the firearm, ammunition, and statements made by Defendant.

The Court held a suppression hearing on May 3 and 4, 2012 (the "Hearing"). The Government presented four witnesses: New York City Police Department ("NYPD") Officers Robert Schmidt ("Officer Schmidt"), Gerard Maharaj ("Officer Maharaj"), Astrida Reid ("Officer Reid"), and Lieutenant Patrick Welsh ("Lieutenant Welsh"). Defendant presented six witnesses: NYPD Officers Schmidt and Lakisha Langley ("Officer Langley"); Aron Coleman ("Coleman"), the manager of the Rite Aid pharmacy located at 1679 Bedford Avenue in Brooklyn (the "Rite Aid"); Special Agent Patricia McGrane of the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("Special Agent McGrane"); Phillip Martin ("Martin"), an investigator for the Federal Defenders of New York; and Defendant himself.

Upon consideration of the motion, evidence, and post-hearing briefing, this Court denies the motion by Defendant in its entirety for the reasons stated below.

## FINDINGS OF FACT

At approximately 9:30 a.m. on December 28, 2011, Coleman placed a 911 call to report two black males had stolen cold medicine from the Rite Aid. Gov't Ex. 8; Suppression Hearing Transcript ("Tr."), at 301:20–21. Coleman described one of the men as wearing a blue jacket and blue pants and the other as wearing a black hat and black pants. Gov't Ex. 8. Coleman stated the two men exited the store and fled in the direction of Empire Boulevard. *Id.*

The NYPD radio dispatcher relayed the information from Coleman's 911 call over the dispatch system at approximately 9:31 a.m. Gov't Ex. 9, at 0:45–2:00. The dispatcher relayed a larceny in progress at the Rite Aid involving medication and not involving weapons. *Id.*; Tr., at 13:1–10. At the time of the dispatch, Officer Maharaj and Officer Schmidt were patrolling the Crown Heights neighborhood of Brooklyn where the Rite Aid was located. Tr., at 10:8–12:9. The area surrounding the Rite Aid is predominately African-American. Tr., at 50:6–7.

Officers Schmidt and Maharaj responded to the Rite Aid and spoke briefly with Coleman. Tr., at 13:19–14:22; 35:13–18; 81:24–82:12. Coleman provided the officers with additional descriptions of the two perpetrators. *Id.* At the Hearing, Officer Schmidt testified Coleman stated one of the men wore a red hat and the other wore a shiny, blue bubble jacket. Tr., at 14:25–15:1; 39:11–18. Officer Maharaj testified Coleman stated one of the men wore a red hat, but could not recall any additional description. Tr., at 82:2–12. Coleman testified he could not recall the descriptions he provided the officers in the Rite Aid. Tr., at 303:6–25; 315:11–317:19. The officers did not ascertain at that time the amount of medication stolen and therefore were not in a position to determine whether the larceny was a felony or a misdemeanor. Tr., at 38:10–11; 127:11–24. After speaking briefly with Coleman, the officers left the Rite Aid to canvass the area. Tr., at 16:5–22.

Upon leaving the Rite Aid, approximately seven minutes after Coleman's 911 call, Officer Schmidt radioed that the suspects ran south towards Sullivan Place and east towards Nostrand Avenue. Gov't Ex. 9, at 5:30–6:40. Officer Schmidt provided further description of "male black red baseball hat blue shiny bubble jacket." *Id.* Officer Schmidt testified he "should have given a description of two individuals, one wearing a red baseball hat and the other wearing

3

a shiny blue bubble jacket. But the way [he] put it over the radio, it sounded like it was for one individual." Tr., at 65:22–66:1.

While canvassing the area in their patrol car, Officers Maharaj and Schmidt observed Defendant walking east on Sullivan Place between Bedford Avenue and Stoddard Place, away from the Rite Aid. Tr., at 17:13–18:2; 46:12–15. Defendant was alone. Tr., at 47:1–2. Defendant was wearing a red baseball hat, grey hooded sweatshirt with black trim, blue jeans, red sneakers, and carrying a Burger King bag. Tr., at 47:3–17; Def.'s Ex. A; Gov't Ex. 5A. The officers circled the block and, when they saw Defendant again, he had turned up another street, Stoddard Place, and raised the hood of his sweatshirt over his head. Tr., at 19:15–20:9. It was suspicious to the officers that Defendant raised his hood over his red hat. Tr., at 20:7–9. Because Defendant partially matched the description provided to the officers, was in the vicinity of the Rite Aid shortly after the alleged larceny, and behaved in a manner the officers found suspicious by raising the hood of his sweatshirt over his head, the officers stopped the Defendant to conduct a show-up. Tr., at 19:6–20:9; 25:12–26:2; 85:9–86:14.

At approximately 9:42 a.m., twelve minutes after Coleman placed the initial 911 call, Officers Schmidt and Maharaj pulled their patrol car to a stop alongside Defendant in front of 28 Stoddard Place and Officer Maharaj stopped Defendant. Tr., at 20:7–9; 26:24–27:3; 86:25–86:4. As Officer Maharaj exited the vehicle, Defendant asked Officer Maharaj why he was being stopped. Tr., at 86:3–10; 92:12–22; 153:1–23; 386:4–6; 409:14–20. Officer Maharaj told Defendant he fit the description of someone who just committed a crime. Defendant turned to walk away and Officer Maharaj placed his right hand on Defendant's right shoulder. Tr., at 86:3–87:23; 92:12–94:20; 153:1–154:19; 386:4–6; 409:14–20. Defendant rolled his shoulder as if to shrug off Officer Maharaj's hand, raising Defendant's sweatshirt and exposing the handle of

4

a gun in the right side of Defendant's waistband. Tr., at 87:23–88:6; 94:11–25; 155:1–22. Officer Maharaj removed the gun from Defendant's waistband and instructed Officer Schmidt to place handcuffs on Defendant, which Officer Schmidt did. Tr., at 20:23–21:25; 88:8–97:7; 156:21–158:18. Officer Maharaj and Officer Schmidt each conducted an additional frisk of Defendant. Tr., at 23:2–3; 96:9–16; 163:8–164:1. Officer Schmidt placed Defendant in the back of the patrol car and Officer Maharaj radioed for a supervisor to verify the arrest. Tr., at 23:2–19; 96:14–25. Lieutenant Welsh arrived at 28 Stoddard Place shortly thereafter and verified the arrest. Tr., at 250:3–4. Officers Reid and Langley also arrived for a show-up with Coleman. Tr., at 97:24–99:9; 214:5–13; 294:1–2. Coleman verified Defendant was not one of the men who committed the larceny, and Officers Reid and Langley returned to the Rite Aid with him to perform an inventory, which revealed that the perpetrators stole approximately fifty boxes of cold medication. *Id.*; Tr., at 215:11–217:2; 241:4–20.

The testimony by Defendant differed in several respects from the testimony by the witnesses for the government, particularly Officers Schmidt and Maharaj. Defendant testified his hood was raised over his head both the first time Officers Schmidt and Maharaj passed him and when they pulled up alongside him. Tr., at 381:12–13. Defendant testified he did not turn to walk away from Officer Maharaj but, rather, could not have because Officer Schmidt was already blocking his path. Tr., at 385:5–25.

The Court does not credit the testimony of the Defendant. As an initial matter, Defendant, in response to a direct question from the Court as to whether he possessed firearms prior to December of 2011, responded "no, sir, none whatsoever."[1] Tr., at 397:7–19. However, Defendant previously has been convicted of, *inter alia*, Criminal Possession of a Loaded Firearm

---

[1] Defendant argues he misunderstood the question asked by the Court. However, the question was simple and clear—"Did you ever own any firearms prior to [mid-December of 2011]"— and the answer provided by the Defendant was untruthful. Tr. 397:17–19.

5

in the Third Degree in violation of New York State Penal Law § 265.02 on two separate occasions—October 18, 2000 and January 6, 2005—and was adjudicated as a juvenile defendant in connection with his arrest for the same charge on December 16, 1997. Tr., at 401:3–402:24.

Furthermore, Defendant's testimony differed in several respects from the declaration he submitted in connection with the instant motion a month prior to the Hearing. Def.'s Mot. to Suppress, Ex. E ("Decl."). Defendant testified to several facts for the first time on direct examination, and, while the addition of detail is not in itself dispositive, the extent to which seemingly pertinent details were left out of his declaration impugn his credibility as a whole. One such example is Defendant testified at the Hearing to hearing tires screeching while he walked up Stoddard Place, turning, and seeing Officers Maharaj and Schmidt's patrol car reversing at a high rate of speed against traffic on Sullivan Place. Tr., at 381:15–19; 406:23–408:19. Defendant references only two police cars in total in his declaration, whereas it was definitively established at the Hearing that three police cars arrived in front of 28 Stoddard Place during the course of the events at issue: the patrol car containing Officers Maharaj and Schmidt, the patrol car containing Officers Reid and Langley, and the patrol car containing Lieutenant Welsh. In his declaration, Defendant stated the firearm was in his pants but not in his waistband. Decl., at ¶ 5. On direct examination, Defendant testified the firearm was held in place by his belt—somehow distinguished from his waistband, around which a belt would typically go—and under long johns and three shirts. Tr., at 387:2–19; 411:6–414:17. During cross-examination, Defendant conceded the gun was in his waistband. Tr., at 403:23–25.

Simply put, the testimony offered by Defendant is not credible. By contrast, while the testimony of the Government's witnesses was not identical in all respects, it was with respect to the facts material to the decision of this Court.

6

## ANALYSIS

The Fourth Amendment of the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The protections guaranteed by the Fourth Amendment "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest," also known as *"Terry"* stops. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also Terry v. Ohio*, 392 U.S. 1, 9 (1968). "Because the balance between the public interest and the individual's right to personal security tilts in favor of a standard less stringent than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion that criminal activity may be afoot." *Arvizu*, 534 U.S. at 273 (quotations omitted).

Courts are bound to consider the totality of circumstances in evaluating the purported basis of reasonable suspicion. *United States v. Cortez*, 449 U.S. 411, 417 (1981). That is, "[b]ased upon the whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 417–18. Reasonable suspicion entails a "level of suspicion [that] is considerably less than proof of wrongdoing by a preponderance of the evidence[,]" requiring the officer to articulate "'some minimal level of objective justification' for making the stop." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)). The conduct forming the basis of reasonable suspicion need not be—and, indeed, often is not—illegal. *Sokolow*, 490 U.S. at 9 (citing *Cortez*, 449 U.S. at 417–19; *Reid v. Georgia*, 448 U.S. 438, 441 (1980); *Terry*, 392 U.S. at 22).

Before this Court can determine whether Officers Maharaj and Schmidt had reasonable suspicion to stop Defendant, it "must first determine the precise moment that the *Terry* stop was executed by the officers, namely, when [Defendant] was 'seized,' because only 'the facts available to the officer at the moment of the seizure may be evaluated in determining whether reasonable suspicion warranted the detention.'" *United States v. Mitchell*, No. 08-CR-775, 2009 WL 1472834, at *6 (E.D.N.Y. May 27, 2009) (Matsumoto, J.) (quoting *Terry*, 392 U.S. at 21–22). Not all exchanges between police officers and civilians constitute seizures. A seizure occurs when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Terry*, 392 U.S. at 19 n.16); *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1991) ("We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave."). Police officers do not "violate the Fourth Amendment by merely approaching an individual on the street or in another public place [or] by asking him if he is willing to answer some questions [,]" nor does the "person approached need [to] answer any questions put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Florida v. Royer*, 460 U.S. 491, 497–98 (1983).

Defendant argues he was seized for Fourth Amendment purposes when Officers Schmidt and Maharaj exited their patrol car and blocked his path. Def.'s Mem., at 6, 9–10. While Defendant's argument requires findings of fact this Court explicitly rejects, it is worth noting that the facts as Defendant construes them do not alter the circumstances pertinent to the Court's analysis.

The record demonstrates Officers Maharaj and Schmidt pulled alongside Defendant, Officer Maharaj exited the car, and, as he approached Defendant, told Defendant he fit the description of someone who had just commit a crime. As Defendant turned to walk away, Officer Maharaj placed his right hand on Defendant's right shoulder. Tr., at 86:3–87:23; 92:12–94:20; 153:1–154:19; 386:4–6; 409:14–20. Officers Maharaj and Schmidt did not merely approach Defendant on the street and ask him if was willing to answer some questions. A reasonable person, when stopped by the police and told he matched the description of someone who had just committed a crime, would not feel free to walk away regardless of whether it was his right to do so. However, that Defendant felt free to turn and walk away indicates that his liberty was not restrained. Defendant unquestionably was seized when Officer Maharaj placed his hand on Defendant's shoulder; the issue is whether Officers Schmidt and Maharaj had reasonable suspicion to stop Defendant immediately prior to that point. The Government argues that they did, and this Court agrees.

Defendant, an African-American male wearing a red baseball hat, partially matched the description provided to them by Coleman. Defendant was in close proximity to the Rite Aid only minutes after Coleman placed the 911 call. Defendant raised his hood over his head after the Officers first passed him in their patrol car on Sullivan Place and turned up Stoddard Place, a fact Officer Schmidt expressly found suspicious.

None of these circumstances, standing alone, provides an adequate basis for reasonable suspicion. Defendant is an African-American male, but the neighborhood surrounding the Rite Aid is predominantly African-American. Defendant was wearing a red baseball hat, but there is nothing inherently suspicious about red baseball hats. Defendant was in close proximity to the crime shortly after it occurred, but the crime occurred in a densely populated area on a weekday

morning. Defendant raised his hood over his head, but such a gesture is not inherently indicative of criminality, particularly not in winter. However, reasonable suspicion examines the totality of the circumstances simultaneously, not each individual circumstance in isolation. Here, the totality of the circumstances warranted a brief investigatory stop. That other means of investigation might have been available, as Defendant speculates, does not diminish the fact that the officers articulated an objective and adequate foundation for reasonable suspicion under the facts as they actually existed. Def.'s Mem., at 9; Def.'s Post-Hr'g Br., at 21; Def.'s Post-Hr'g Reply Br., at 9.

Defendant argues, regardless of whether he turned to walk away as Officer Maharaj approached him, "the Supreme Court had made clear that a 'refusal to cooperate with the police does not furnish the minimal level of objective justification needed for a detention or seizure.'" Def.'s Post-Hr'g Br., at 23 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (additional internal quotations omitted). Defendant correctly states the law. Indeed, "he may not be detained even momentarily without reasonable objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Royer*, 460 U.S. at 498. However, the officers' suspicion was not based on Defendant's refusal to cooperate, but on no fewer than four other circumstances: a partial match with Coleman's description, Defendant's proximity to the crime in time and location, Defendant raising his hood over his head after seeing the officers, and Defendant turning up a side street after the officers passed. Reasonable suspicion existed whether or not the Defendant immediately submitted to Officer Maharaj's questioning.

Defendant next argues it was impermissible for Officer Maharaj to grab Defendant's shoulder because the crime in question was a misdemeanor and it was already complete. Def.'s

10

Mem., at 9; Def.'s Post-Hr'g Br., at 19–21; Def.'s Post-Hr'g Reply Br., at 7–10. This argument also fails for at least two reasons. First, the officers were not in a position to determine the value of the merchandise stolen, and hence, whether the crime was a misdemeanor or a felony, until after employees of the Rite Aid had taken an inventory. That the total value, when it was determined after the stop and frisk occurred, rendered the crime a misdemeanor does not suffice to undercut the reasonableness of the stop at issue here. For this Court to hold otherwise would sterilize an important function of law enforcement. Additionally, while certain appellate courts have stated an investigatory stop is permissible where law enforcement has "reasonable suspicion of a completed felony, though not of a mere completed misdemeanor," neither the United States Supreme Court nor the Second Circuit has imposed a bright line test for when a *Terry* Stop to investigate a completed crime is forbidden. *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004); Def.'s Post-Hr'g Reply Br., at 8 n.7.; Gov't's Post-Hr'g Br., at 23–25. However, this Court notes the Government has a strong interest in solving crimes and bringing offenders to justice. Larceny can pose a threat to public safety because the crime involves an inherent risk of confrontation. The fact that none occurred here is irrelevant. The investigatory stop in this case would have been a *de minimus* intrusion on Defendant's personal security were it not for the illegal handgun tucked in his waistband. *See United States v. Hensley*, 469 U.S. 221, 228 (1985); *United States v. Grigg*, 498 F. 3d 1070, 1077 (9th Cir. 2007); *United States v. Moran*, 503 F. 3d 1135, 1140–41 (10th Cir. 2007)

Lastly, Defendant argues the description provided by Coleman was too unreliable to form the basis for reasonable suspicion. Defendant argues reasonable suspicion "requires that there must be some reason to believe not only that the [informant] was honest but also that he was well informed." Def.'s Post-Hr'g Br., at 11 (quoting *United States v. Brown*, 448 F.3d 239, 250 (3rd

Cir. 2006)). Defendant relies on several cases involving anonymous informants, secondhand information from known informants, and inconsistent information from informants. *United States v. Elmore*, 482 F.3d 172 (2d Cir. 2007); *Brown*, 448 F.3d at 248–50; *United States v. Montiero*, 447 F.3d 39 (1st Cir. 2006). Defendant's argument and authority do not fit the facts of this case. The informant here, Coleman, was known, the information he provided was firsthand, and he supplemented the information he conveyed in his 911 call with additional description of the perpetrators when Officers Maharaj and Schmidt interviewed him in the Rite Aid less than ten minutes after the 911 call. Coleman was the manager of the Rite Aid where the crime occurred, confronted the perpetrators himself (Tr., at 299:11–300:18), and was the person responsible for calling 911. Officers Maharaj and Schmidt had reason to believe he was both honest and well-informed.

## CONCLUSION

The Government has demonstrated reasonable suspicion for stopping Defendant on the morning of December 28, 2011. The motion by Defendant, Mr. Roy Haynesworth, to suppress the evidence recovered following the stop of Mr. Haynesworth and to suppress the statements he made as the products of an unlawful arrest is DENIED.

**SO ORDERED**

Dated: Brooklyn, New York
July 24, 2012

s/William F. Kuntz, II

HON. WILLIAM F. KUNTZ, II
United States District Judge